Clerk
District Court

AUG - 8 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

Law Office of G. Anthony Long
P. O. Box 504970, Second Floor Lim's Bldg.
San Jose, Saipan, MP 96950
Telephone No. (670) 235-4802
Facsimile No. (670) 235-4801

Attorney for Defendant

### IN THE UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CRIMINAL ACTION NO. 03-0001 |
| | ) |
| Plaintiff | ) DEFENDANT'S RESPONSE |
| | ) TO MOTION REGARDING THE |
| v. | ) EXISTENCE OF THE MARITAL |
| | ) COMMUNICATION PRIVILEGE |
| VANN LE | ) |
| | ) Date: |
| Defendant | ) Time: |
| | ) Judge: Tashima |

Federal common law recognizes two different marital privileges. *United States v. Marashi*, 913 F.2d 724, 729 (9th Cir.1990). One bars testimony concerning statements privately communicated between spouses and may be invoked by the testifying or nontestifying spouse ("marital communications privilege"). *Id.* The second permits a person to refuse to testify against her spouse about anything ("testimonial privilege"). *Id.*; *Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980) (holding that the privilege lies

with the testifying spouse). In this case, the prosecution has moved for an order that the "marital communications privilege" cannot be utilized to bar testimony of Le's spouse concerning certain alleged statements Le made to her.

Le acknowledges that the "marital communications privilege" cannot be asserted if the husband and wife are permanently separated at the time statements are alleged to have been made. *United States v. Roberson*, 859 F.2d 1376, 1381 (9th Cir. 1988). The prosecution apparently is relying on this exception to the privilege in connection with the alleged testimony of Le's spouse.

The prosecution bears the burden of demonstrating that the privilege does not exist. *Marashi*, 913 F.2d at 729. This burden has not been met in this case as the prosecution's motion is not accompanied by a declaration, affidavit or any writing from Le's spouse claiming that she and Le were permanently separated at the time Le supposedly made statements to her. This is crucial as the determination of separation and its permanency or irreconcilability are questions of fact for resolution by the court. *Id* ; *United States v. Murphy*, 65 F.3d 758, 761 (9th Cir. 1995). Arguments or assertions of counsel are not facts. *Texas Dept. of Community Affairs v. Burdine,*
450 U.S. 248, 255 n.9,  101 S.Ct. 1089, 1095 n.9, 67 L.Ed.2d 207(1981)[Argument of counsel does not constitute facts and is insufficient to meet burden of proof].

The prosecution has not met its burden of proof as its motion rests solely on assertion of counsel.

However, if the court decides to consider the prosecution's motion, then it must determine whether Le and his spouse were separated at the time of the alleged statements and then determine the irreconcilability of the couple. *Roberson*, 859 F.2d at 1381. This entails a factual inquiry by the court, *Id*, which necessitates a hearing at which time Le can challenge the prosecution's evidence and present his own evidence. As noted in *Roberson,* the determination should be made by considering:

> [i]n making a determination regarding irreconcilability, the district court should consider whether, at the time of the communication, a divorce action had been filed and the subsequent relationship of the parties prior to the communication. The judge may wish to hear testimony and may consider documentary evidence such as the divorce pleadings or a settlement agreement. For example, substantially supported allegations of gross misconduct or grievances over a period of time or a proposal for property settlement may distinguish the failed marriage from the occasional disharmony that sometimes accompanies these relationships. Other useful evidence would include statements by either party regarding irreconcilability or the reasons for a prolonged absence from the home. From this evidence and for the record, the trial judge should make a factual determination about the separation and irreconcilability of the couple.

*Id*. The determination in this case requires a factual hearing as the prosecuiton has not proffered any substantiated or reliable allegation or facts that Le and his wife

Page 3 of 4

were permanently separated at the time of the alleged statements. Indeed, the grand jury testimony of Muhhammad Shafiqul Islam shows that Le and his spouse were not permanently separated. See Grand Jury Testimony of Islam at 2-3.

## CONCLUSION

The prosecution's motion should be denied as it is not supported by assertion of counsel and not by facts. Alternatively, a hearing is necessary to determine whether or not the marital communications privilege exists with respect to the alleged statements of Le.

Dated this 8th day of August, 2005.

Law Office of G. Anthony Long

By: _____
G. Anthony Long

# TRANSCRIPT OF MUHHAMMAD SHAFIQUL ISLAM'S GRAND JURY TESTIMONY

<u>FEDERAL GRAND JURY</u>
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

CASE NAME:   Investigative session

**REPORTER'S TRANSCRIPT**

of witness

MUHHAMMAD SHAFIQUL ISLAM taken on Wednesday, February 5, 2003, before the Federal Grand Jury and Patrick Smith, Assistant United States Attorney, Horiguchi Building, Third Floor, Garapan, Saipan.

**Transcribed by:**
JUDICIAL SERVICES, PLUS
2nd Floor, Sablan Building, Chalan Piao
Saipan, MP 96950
(670) 235-7585

2 LE-00301

```
 1        GARAPAN, SAIPAN, COMMONWEALTH OF THE N. MARIANA ISLANDS
 2                          P R O C E E D I N G S
 3                            February 5, 2003
 4        ...[Oath administered by the Foreperson].
 5        WITNESS:  Yes.
 6                          E X A M I N A T I O N
 7                                   OF
 8                        MUHHAMMAD SHAFIQUL ISLAM
 9   BY MR. SMITH:
10   Q    Sir, would you please state your name?  Keep your voice
11        up, speak into the microphone and spell each part of
12        your name.
13   A    Muhhammad Shafiqul Islam.
14   Q    Please spell each name in your name, please?
15   A    M-U, double, H-A, double M-A-D.
16   Q    All right, and the next name?
17   A    S-H-A-F-I-Q-U-L, Shafiqul Islam, I-S-L-A-M.
18   Q    Now, you're appearing here today pursuant to a
19        subpoena, is that right, Mr. Islam?
20   A    Yes.
21   Q    Okay, I want to explain a few things to you about how
22        things work, give you an advise about some of your
23        rights.  Please listen.  If you have any questions,
24        interrupt and ask questions.
25             Presently you're a subject of the investigation
```

2 LE-00302

1    here.  In other words, you are a person whose conduct
2    is within the scope of the Grand Jury's investigation.
3    You can refuse to answer any question if a truthful
4    answer to the question would tend to incriminate you.
5    Anything that you do or say may be used against you in
6    a subsequent legal proceeding.
7         If you have retained counsel who represents you
8    personally, the Grand Jury will permit you a reasonable
9    opportunity to step outside the Grand Jury room and
10   confer with counsel, if you desire.
11        Testimony is given under oath and is being
12   recorded.  You can be prosecuted for perjury or making
13   false statements or for obstruction of justice if you
14   fail to testify truthfully.  Do you understand what
15   I've just told you?
16 A  Yes, I understand.
17 Q  Okay, where do you work, sir?
18 A  I am work at, ah Mas Marine at Dai-Ichi beach.
19 Q  Mas Marine?
20 A  Yes.
21 Q  Who's your boss?
22 A  Vann Le before, but now-a-days it's Yuki Le.
23 Q  Yuki Le is Vann Le's wife?
24 A  Yes.
25 Q  Are they still together?  Or are they about to get a

| | | |
|---|---|---|
| 1 | | divorce? |
| 2 | A | Ah they are still together. |
| 3 | Q | Okay, where is Vann Le now? |
| 4 | A | I don't know. |
| 5 | Q | Do you know what country he's in? |
| 6 | A | Ah, more than four months ago he call me one time at |
| 7 | | the beach, I don't know where he is. |
| 8 | Q | Okay, so you are telling us that you're not in regular |
| 9 | | contact with Vann Le? |
| 10 | A | Yes. |
| 11 | Q | He doesn't call you? |
| 12 | A | No. |
| 13 | Q | And, you don't know whether or not he's in Japan? |
| 14 | A | Yes. |
| 15 | Q | Just so we're clear, sitting here today you do not know |
| 16 | | where he is, that's your testimony? |
| 17 | A | Yes, I don't know where he is now. |
| 18 | Q | Okay, do you know why he left Saipan? |
| 19 | A | No. |
| 20 | Q | Do you know why he has not returned to Saipan? |
| 21 | A | Somebody called him and he call me before and he knows |
| 22 | | somebody find something at his house that's why he |
| 23 | | don't come. |
| 24 | Q | What was found at his house? |
| 25 | A | I don't know.  He say he's not gonna come back anymore. |

-3-

2 LE-00304

| | | |
|---|---|---|
| 1 | Q | Do you know what was found at his house? |
| 2 | A | No, I don't know that. |
| 3 | Q | Do you know that guns were found at his house? |
| 4 | A | Yeah, I -- I know the guns for shooting range, we use |
| 5 | | it, that one they found. |
| 6 | Q | Okay, so when I asked you just one minute ago what was |
| 7 | | found at his house, you knew that it was a gun that was |
| 8 | | found at his house, right? |
| 9 | A | For our shooting range. |
| 10 | Q | Right, so when I ask you a question, Mr. Islam, you |
| 11 | | gotta give the complete truthful answer, you |
| 12 | | understand? |
| 13 | A | Yes. |
| 14 | Q | So when I ask you like you knew what was found at his |
| 15 | | house, you can't say you don't know when you know it |
| 16 | | was a gun. Who told you what was found at his house? |
| 17 | A | No, when the police officer when I went to bring my -- |
| 18 | | take my key from the Police Station? That's the time. |
| 19 | Q | Isn't it true, sir, that you're the one who called Vann |
| 20 | | Le in Japan and told him that Robert had been caught |
| 21 | | with a gun? Robert Fanway had been caught with a gun? |
| 22 | A | No. |
| 23 | Q | Didn't you talk to Vann Le while he was in Japan and |
| 24 | | tell him Robert had the gun and you better not come |
| 25 | | back? |

1  A  No.

2  Q  Are you telling us you never had that conversation
3     with?

4  A  No, I don't tell him that.

5  Q  Did you ever have drinks at Johnny's Bar?  Ever go
6     there for drinks?

7  A  Yes.

8  Q  Did you ever go there with Vann Le, Lionel Borja, and
9     others?

10 A  No.

11 Q  You were never at Johnny's Bar with Vann Le?

12 A  No.

13 Q  Never, not once?

14 A  Never.

15 Q  Were you ever at Johnny's Bar with Lionel Borja?

16 A  Yeah, once.  Once time.

17 Q  Were you ever at Johnny's Bar when Norman Kapileo was
18    there?

19 A  Yeah, once.

20 Q  Were you ever at Johnny's Bar when Roland Kapileo was
21    there?

22 A  Yes.

23 Q  Were you ever all together at the bar?

24 A  No.  Different days, different times.

25 Q  Okay, how often would you go to Johnny's Bar?

-5-

| | | |
|---|---|---|
| 1 | A | Maybe seven? Maybe eight times? |
| 2 | Q | Did you ever have a conversation with others at |
| 3 | | Johnny's Bar in which the subject of the City Trust |
| 4 | | Bank robbery came up? |
| 5 | A | No. |
| 6 | Q | You weren't there when Vann Le, Lionel Borja and Norman |
| 7 | | Kapileo were having drinks and talking about the |
| 8 | | robbery? |
| 9 | A | No, I was not there. |
| 10 | Q | Okay, did you ever talk to any of those individuals, |
| 11 | | Vann Le, Lionel Borja and Norman Kapileo about who |
| 12 | | robbed City Trust Bank? |
| 13 | A | No, I don't know. |
| 14 | Q | Did anybody ever tell you who robbed City Trust Bank? |
| 15 | A | No. Nobody tell me. |
| 16 | Q | Did any of the police officers ever mention who they |
| 17 | | thought robbed City Trust Bank? |
| 18 | A | No. |
| 19 | Q | What's your current immigration status? |
| 20 | A | I'm alien worker. |
| 21 | Q | Alien worker, and is our immigration current? Is your |
| 22 | | permit current? |
| 23 | A | Yes, my boss is the one processing my papers now a |
| 24 | | days. |
| 25 | Q | Who is that? |

-6-

2 LE-00307

```
 1    A    Yukiguchi.

 2    Q    She's processing your papers?

 3    A    Yes.

 4    Q    And, if your papers are not processed, what happens?

 5         What do you have to do?

 6    A    Mean I have to go back.

 7    Q    Go back where?

 8    A    Go back to Bangladesh.

 9    Q    Go back to Bangladesh.  That's where you were born?

10    A    Yes.

11    Q    Did you ever talk to Jason Ruluket about the bank

12         robbery?

13    A    No.

14    Q    Okay, did you ever talk to any of these people whose

15         names I've mentioned, Vann Le, Norman Kapileo, Roland

16         Kapileo, Lionel Borja, Jason Ruluket about who robbed

17         poker parlors in Saipan?

18    A    I don't know.

19    Q    Never?  No one ever mentioned that to you?

20    A    No.

21    Q    Okay, but you did know that Vann Le had ah -- ah there

22         were guns at Vann Le's house.  Did he ever show you

23         those guns?

24    A    No, he never show me a gun.

25    Q    Did you ever go to the shooting gallery and see guns?
```

-7-

2 LE-00308

| | | |
|---|---|---|
| 1 | A | Yeah, I saw the only the shooting range gun. |
| 2 | Q | What kind of guns? |
| 3 | A | The one only like, the one we using at shooting range? |
| 4 | | That's the one. |
| 5 | Q | Just a rifle? |
| 6 | A | Yeah. |
| 7 | Q | No handguns? |
| 8 | A | No handgun. |
| 9 | Q | You never saw a silver handgun? |
| 10 | A | No. |
| 11 | Q | Mr. Islam, there's a basis, in other words, a reason to |
| 12 | | ask you questions about what you know.  In other words, |
| 13 | | other people have given statements to law enforcement |
| 14 | | investigators, to FBI agents, to the police that tell |
| 15 | | us that you had conversations with people about the |
| 16 | | bank robbery and about guns.  Common sense tells us |
| 17 | | that those people are not making those stories up, so |
| 18 | | we subpoenaed you and brought you in here because the |
| 19 | | Grand Jury has a right to know what you know, okay? |
| 20 | | You don't have a right to withhold that information and |
| 21 | | give false testimony, do you understand that? |
| 22 | A | Yes. |
| 23 | Q | And, that if it's later found out that you've given |
| 24 | | false testimony in this Grand Jury, there's gonna be |
| 25 | | serious consequences including federal criminal charges |

2 LE-00309

1   and a definite deportation out of the CNMI, do you
2   understand that?
3  A   Yes, I understand.
4  Q   Now, knowing all that, do you wanna change any of the
5   testimony that you've given us here today?
6  A   No.
7   MR. SMITH:  I'd ask that the witness be excused,
8   please?  He does not need to stick around.
9   FOREPERSON:  Okay.
10   ***END OF TESTIMONY***
11
12   C E R T I F I C A T I O N
13   I, Celina A. Concepcion, of Judicial Service, Plus,
14  hereby certify:
15   That the foregoing is a true and correct transcript of
16  the electronic sound recording of the proceedings in the
17  foregoing matter transcribed under my direction and
18  thereafter verified by me to the best of my knowledge and
19  ability.
20   Dated at Saipan, CNMI, this 31st day of May, 2003.
21
22   _____
           Celina A. Concepcion
23
24
25

-9-