FILED
Clerk
District Court

AUG 18 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

# TRIAL MINUTES OF THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

CR-03-00001                                      August 18, 2005
                                                 8:20 a.m.

### UNITED STATES OF AMERICA -v- VANN LE, et., al.

PRESENT:    Hon. Alex R. Munson, Chief Judge Presiding
            Sanae Shmull, Court Reporter
            K. Lynn Lemieux, Courtroom Deputy
            Timothy Moran, Assistant U. S. Attorney
            G. Anthony Long, Attorney for Defendant
            Vann Le, Defendant

PROCEEDINGS: **EVIDENTIARY HEARING** to determine if the Government Acted in Bad
Faith or if the Defendant is Prejudiced

    Government by Timothy Moran, AUSA.  Attorney G. Anthony Long was present on
behalf of and with defendant, Vann Le.  Also present was Joseph Auther, Special Agent, FBI.

    Government called witness:

    **JOSEPH  AUTHER**. DX. CX. RDX.   Ex. A (FD-302);  Ex. B (Reporter's Transcript of
Edward Manalili's testimony).  Witness was excused.

    Defense called witness:

    **EDWARD MANALILI**. DX. CX. RDX.  Witness was excused.

    Government argued. Defense argued.  Court, after hearing all argument, **RULED** that the
defense  had not proved a showing of bad faith by the Government.   However, Court ordered
that there be added jury instructions.

                    Court adjourned at 9:30 a.m.

                    K. Lynn Lemieux,  Courtroom Deputy

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    08/17/2005

On August 17, 2005 SA Joseph E. Auther reviewed the case file in VANN LE, ET Al, HOBBS ACT for any record of consensual recordings made by or with JASON RULUKED. No record of any recordings was found.

The FBI Saipan office has three digital "body recorders". Each of these recorders is "downloaded" after use and the contents erased from the recording device. There are no records to indicate which recorder was used by JASON RULUKED on or about December 2002 to attempt consensual recordings.

On August 17, 2005 Major Edward Manalili, Department of Public Safety, advised that RULUKED was provided a recording device to conceal on his person during meetings with suspects in captioned case. However, contrary to instructions provided to him by Manalili, RULUKED abandoned the device on Managaha island. It was retrieved by FBI and DPS personnel the following day in a trash can.

According to Manalili, Assistant United States Attorney Patrick Smith opined that the abandonment of the device and RULUKED's failure to keep it in his possession rendered any recordings picked up by the device illegal. Smith advised that if any recordings were made, they should be erased.



Investigation on    8/17/2005    at  Saipan, CNMI

File #  192B-HN-17212                               Date dictated

by    SA Joseph E. Auther/jea

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

---

FEDERAL GRAND JURY
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

CASE NAME:    Investigative session

REPORTER'S TRANSCRIPT

of witness

EDWARD H. MANALILI taken on Wednesday, February 5, 2003, before the Federal Grand Jury and Patrick Smith, Assistant United States Attorney, Horiguchi Building, Third Floor, Garapan, Saipan.

Transcribed by:
JUDICIAL SERVICES, PLUS
2nd Floor, Sablan Building, Chalan Piao
Saipan, MP 96950
(670) 235-7585



2 LE-00311

1    GARAPAN, SAIPAN, COMMONWEALTH OF THE N. MARIANA ISLANDS

2                    P R O C E E D I N G S

3                      February 5, 2003

4        ...[Oath administered by the Foreperson].

5        WITNESS:  Yes, I do.

6                    E X A M I N A T I O N

7                            OF

8                    EDWARD H. MANALILI

9    BY MR. SMITH:

10   Q    Good morning, please state your name and spell your

11        last name for the record?

12   A    Edward H. Manalili, M-A-N-A-L-I-L-I.

13   Q    And, where do you work?

14   A    Department of Public Safety.

15   Q    And, what's your rank there?

16   A    Lieutenant.

17   Q    And, how long have you been with DPS?

18   A    Approximately 11 years.

19   Q    Did you have any law enforcement experience before

20        you started with DPS?

21   A    Yes, I was in the United States Marine Corps MP for

22        approximately nine years.

23   Q    And, what's your current assignment at DPS?

24   A    I'm assign to the FBI-CNMI Task Force.

25   Q    And, how long have you been assigned to the Task Force?

                            -1-

1    A    I've been on the Task Force for approximately six

2         years.

3    Q    And, could you just -- I think the Grand Jury has heard

4         some evidence about the DEA-CNMI Task Force, but if you

5         would just tell us please what the FBI-CNMI Task Force

6         does?

7    A    The FBI-CNMI Task Force investigate, ah violent crimes

8         and, ah mostly crimes not related to drugs.

9    Q    So, more or less a cooperative arrangement between

10        Federal and local law enforcement to coordinate

11        investigations?

12   A    That's correct.

13   Q    Now, I'd like to ask you first, on the Task Force in

14        the Summer and Fall of 2001, were you and others at the

15        FBI investigating a ring or organization involved in

16        illegal gambling, allegations of illegal prostitution,

17        and allegations of money laundering?

18   A    That's correct.

19   Q    And, just tell us generally about that, we'll call it

20        the organization, what they were up to?

21   A    Ah, early 2002 a source provided me information about a

22        Japanese organization, ah that was involved in illegal

23        gambling, prostitution, money laundering, and loan

24        sharking.

25   Q    And, when you say loan sharking, what are you referring

-2-

1           to?

2     A     They were providing, ah loans to the customers at the

3           illegal gambling with a very high interest rate.

4     Q     And, when customers who didn't pay the loan on time

5           with the very high interest rate, would this

6           organization sometimes resort to strong arm tactics,

7           threats of violence to collect debts?

8     A     That's correct.

9     Q     So, these were the general allegations that you were

10          investigating in the Spring, Summer of 2002?  I think I

11          misspoke before when I said 2001, we're talking 2002?

12    A     That's correct.

13    Q     And, this source that you have, is it correct that it's

14          a Japanese person who is someone who has a cooperation

15          agreement with the Government who has maintained his

16          undercover, if you will, undercover capacity and no one

17          knows he's a cooperator, is that right?

18    A     That's correct.

19    Q     Are you familiar with the term Yakuza?

20    A     Yes, I am.

21    Q     And, just briefly tell us what that is?

22    A     Yakuza is the Japanese organize crime.

23    Q     And, has your investigation revealed that the Yakuza, a

24          Japanese organize crime elements are involved in or

25          sponsoring this organization you have under

-3-

1              investigation here in Saipan?

2    A    That is correct.

3    Q    Okay, now just -- we'll put that on hold for a second

4         and I direct your attention to April 12, 2002.  Did you

5         learn that day that the City Trust Bank robbery was

6         robbed?

7    A    That's correct.

8    Q    City Trust Bank Branch was robbed?

9    A    Yes, that's correct.

10   Q    Did you, personally, participate in the investigation

11        at that time of who robbed the City Trust Bank Branch

12        on Gualo Rai?

13   A    No, I didn't.

14   Q    Who from the FBI was involved in that investigation?

15   A    The Special Agent Linda Mayberry, Special Agent Mark

16        Procopio and ah, Task Force Officer Juan Dela Cruz.

17   Q    He's one of your colleagues on the Task Force?

18   A    That's correct.

19   Q    And, was DPS also conducting an investigation in the

20        sense that it was interviewing witnesses and collecting

21        evidence from the crime scene?

22   A    That's correct.

23   Q    Are you familiar with the evidence that was obtained

24        from at crime scene?

25   A    Yes, I am.

-4-

2 LE-00315

1    Q    Could you give us a brief summary, sir of what physical

2         evidence or forensic evidence was obtained at the crime

3         scene?

4    A    Ah there was a shoe print that was lifted there from

5         the front of the teller where supposedly one of the

6         robbers, ah stood and collected the -- took the money

7         from the teller, there was a set of hand prints from

8         the counter area where one of the robbers had jumped

9         over the counter, and there was a bullet that was

10        recovered from one of the office dividers.

11   Q    And, based upon statements that were taken from

12        witnesses, how did that bullet wind up in one of the

13        office dividers?

14   A    One of the robbers discharged a handgun in the bank.

15   Q    And, did you, your colleagues at DPS also recover some

16        wrappers that are used to wrap up money?

17   A    That's correct, the money wrapper was found in one of

18        the trails behind the building.

19   Q    Now, you didn't personally interview witnesses at that

20        time in connection with what they saw inside the bank

21        branch, is that correct?

22   A    That's correct.

23   Q    Have you reviewed reports prepared by your colleagues

24        of what witnesses...[sneeze in background] observed --

25        ah bless you, witnesses observed during the bank

-5-

2 LE-00316

1        robbery?

2    A    Yes.

3        MR. SMITH:   I have a pillar of -- no, just leave those

4    there, we'll get those a little bit later, I hate to see

5    anyone hurt their back on those medical records.

6        Now, ladies and gentlemen, I'm sure you're familiar

7    with the standard warning on hearsay, but I'm gonna give it

8    to you again.

9        Lt. Manalili is now gonna tell you what's in the

10   reports of what witnesses said, that's obviously a hearsay

11   account, what happened in the bank.   You're permitted to

12   rely on hearsay here in the Grand Jury in considering

13   whether probable cause exists to return an indictment.

14       If you wanna hear from a particular witness, let us

15   know and we'll try and get the witness here, but as I've

16   noted before, this is an efficient way for you to consider

17   the evidence without taking up all the witnesses' time to

18   come in here and testify personally.

19       Okay, Lt. Manalili, having reviewed these reports,

20   including a report by Carmen Santos?

21   A    That's correct.

22   Q    Who is Carmen Santos?

23   A    She was the only on-duty teller at the time of the

24       robbery.

25   Q    And, can you just describe for us what happened inside

-6-

2 LE-00317

1      the bank based on these reports?

2    A    Carmen Santos, the teller, that was on duty was

3          attending to a customer when two individuals walked in

4          to the bank, both individuals had their face covered

5          with what is believe to be a t-shirt, ah the only areas

6          that was exposed was their eye area, both of them had

7          long sleeve shirts.  As they went in, they announced

8          that there was a robbery, one of the individuals asked

9          where the vault was, then he went over to the counter,

10         jumped over the counter looking for the vault, when he

11         did not find the vault behind the counter, he jumped

12         back over the counter and demanded the money from the

13         teller.

14   Q    And, who had the gun?

15   A    The person that did not jump over the counter had the

16        gun.

17   Q    Because at that time the witnesses didn't know any

18        names and they described them as the person with the

19        gun and the person who jumped over the counter, is that

20        correct?

21   A    That's correct.

22   Q    And, at some point during the robbery, the gun was

23        fired?

24   A    That's correct.

25   Q    By the person who did not jump over the counter?

-7-

2 LE-00318

1    A    That's correct.

2    Q    And, you mentioned that the bullet lodged in an office

3         divider?  This wasn't an actual real wall, it was one

4         of these temporary office dividers?

5    A    Yes, that's correct.

6    Q    And, was there some, as expressed in the reports, some

7         fear on the part of bank employees that someone might

8         have been shot because they were behind the divider?

9    A    That's correct.

10   Q    How much money was taken?

11   A    Approximately, $8,600.00.

12   Q    Now, were the witnesses able to describe the firearm,

13        the gun that they saw?

14   A    Yes, ah the witnesses described it as a silver colored

15        handgun.

16   Q    Now, did ah -- withdrawn.  Was anything at the time

17        able to be done with the hand prints you told us about

18        from the counter.  In other words, were they able to

19        match that against some other hand print or

20        fingerprint?

21   A    No.

22   Q    And, can you just explain why not?

23   A    The reason why it was not sent out to the lab is there

24        was no suspect at the time, so there was no known

25        prints, hand print that was lifted from the crime scene

-8-

2 LE-00319

1        to be compared to.

2   Q    Now, the witnesses were unable to identify these two

3        robbers because their faces were covered, but were they

4        able to give a description of what they thought their

5        ethnic or national backgrounds were?

6   A    Yes.

7   Q    And, what did the witnesses say about that?

8   A    The witnesses stated that they were local, ah male that

9        was involved in the robbery.

10  Q    And, fair to say that some witnesses were stronger in

11       their view that they were local, possibly Chamorro,

12       than others who were unable to make a determination

13       about ethnic background?

14  A    That's correct.

15  Q    Did you, in the course of your investigation of this

16       Yakuza backed organization we talked about a few

17       minutes ago, did you come up with a lead or some source

18       information regarding who it was who robbed the bank?

19  A    Yes, I did.

20  Q    And, at that point, just so we're clear, you hadn't

21       worked on the bank robbery at all, is that right?

22  A    That's correct.

23  Q    What did you find out from your source within this

24       organization?

25  A    Initially, when I was investigating the Japanese

-9-

2 LE-00320

1   organization, the source had provided me information

2   that one of the employees of their organization had

3   stolen $60,000.00 and had fled ah, CNMI using a fake

4   passport. Ah later on in the investigation,

5   approximately in September, the source provided me

6   additional information, he told me that the information

7   that he had provided earlier about the Japan --

8   Japanese individual that had left might have been wrong

9   and that the individual might have been killed by the

10   leader of the organization.

11  Q   Okay, and so the source is telling you information he's

12      learning from others who were talking about a possible

13      murder, is that right?

14  A   That's correct.

15  Q   Was he able to at that time tell you who it was who

16      might have murdered this person who left with the

17      $60,000.00?

18  A   Yes.

19  Q   What was the source able to tell you about that?

20  A   He told me that ah, Vann Le was involved in the killing

21      of this person.

22  Q   So, had this source supplied you with reliable

23      information in the past?

24  A   Yes.

25  Q   But nonetheless, this is source information, it's a

-10-

1          start, but far from a completed investigation of this

2          murder information?

3     A    That's correct.

4     Q    Is that murder still under investigation?

5     A    Yes, it is.

6     Q    Now, what about the bank robbery, did the source, was

7          he able to supply you any information about the bank

8          robbery either at the time you learned about Vann Le's

9          participation in the murder or subsequent thereto?

10    A    Yes.

11    Q    What was he able to tell you?

12    A    The source, ah informed me that, ah Vann Le is also

13         involved in the bank robbery.  The source indicated

14         that he had overheard several of the beach boys who

15         were employed by Mas Marine which is own by Vann Le

16         talking about the bank robbery and that, ah Vann Le had

17         bragged about sending -- having his two local boys rob

18         the bank, and the source also provided, ah the name

19         Lionel as being one of the participants in the robbery.

20    Q    Okay, we're gonna talk now, Lt. Manalili, about what

21         you did to corroborate or confirm the source

22         information, but before we do that, just tell us what

23         your investigation has revealed about what Mas Marine

24         is, who owns it, and where it's located?

25    A    Mas Marine is ah, a marine sport concession, it's

-11-

2 LE-00322

1      located between the Dai-Ichi and the Hyatt Hotel and it

2      is owned by Grand--

3      GRAND JUROR:  Can you spell Mas Marine?

4  A   M-A-S.

5      GRAND JUROR:  That's it?  M-A-S?

6  A   Yes, sir.

7      GRAND JUROR:  Marine?

8  A   Mas Marine.

9  Q   Okay.  So, located at the Dai-Ichi Beach Hotel and what

10     kind of business were they involved in?

11  A  Water sports activities, jet skis, banana boats, rides

12     out to Managaha.

13  Q  And, do they have like a hut or a structure on the

14     beach down there?

15  A  Yes, they do.

16  Q  And, who supplied the funding for Mas Marine to set up

17     their operation?

18  A  Ah, the Japanese organization had invested some money

19     into the company.

20  Q  All right, and was Vann Le, was he married?  Or is he

21     married?

22  A  Yes, he is.

23  Q  What's his wife's name?

24  A  Yuki.

25  Q  And, did she or her family supply any money for this

-12-

2 LE-00323

1        business?

2   A   Yes, they did.

3   Q   And, do you know how much?

4   A   Ah from my information, approximately $100,000.00.

5   Q   Now, you used the term beach boys to refer to fellows

6        that are associated with Mas Marine, can you just

7        describe more fully who the beach boys are, where they

8        work, and some of their names?

9   A   The beach boys are the guys that, ah act as instructors

10       and as guides out at the beach when they're out on the

11       jet skies and they're the captain of the boats and, ah

12       some of the beach boys that was employed by Mas Marine

13       is Islam, Ronald Kapileo--

14   Q   Is it Ronald?  Or Roland.

15   A   Roland Kapileo, Norman Kapileo, Lionel Borja, Eddie

16       Igisaiar who's known as Hamboon.

17   Q   Is Igisaiar, just so we're a little clear here spelled

18       I-G-U-I-S-A-R-I?

19   A   Yes.

20   Q   You think okay?  Hamboon, is that a Japanese word for

21       sort of ah, small or short?

22   A   Yes, that's correct.

23   Q   Okay, is there also a fellow name Glenn who works with

24       or for them?

25   A   Yes.

-13-

2 LE-00324

1    Q    Did Vann Le have some other business other than Mas

2         Marine?

3    A    He had an indoor shooting gallery.

4    Q    And, where was that located?

5    A    In Garapan.

6    Q    Now, back to your efforts to corroborate or confirm

7         what you learned from your source in the organization,

8         what did you do after you found out that Vann Le was

9         involved in the bank robbery and that one of the local

10        boys who was sent in, his first name was Lionel, what

11        did you do?

12   A    I contacted the boating safety office and I spoke with

13        one of the police officers at the boating safety and

14        inquired from him if he knew any of the beach boys by

15        the name Lionel.  The officer told me, yes, he did and

16        just the previous week that he had cited Lionel Borja

17        for some violation on the jet ski.

18   Q    So, now you have a last name to go with the first name

19        Lionel, correct?

20   A    That's correct.

21   Q    What did you do with that information?

22   A    I took that name and went down to Motor Vehicle and I

23        pulled his driver's license.

24   Q    Okay, and that yielded a picture?

25   A    Yes.

-14-

2 LE-00325